We have Alyssa Altanaga for the appellant and Maria Reeves for the appellees. Ms. Altanaga, if you are ready to proceed, please begin. May it please the court, Alyssa Altanaga on behalf of John Wilson, Jr. Mr. Wilson served this country in our military. He was honorably discharged and he now receives VA benefits. And although he is incarcerated and he may not receive large sums of money, it is all he has left. This case is about the illegal seizure of a benefit to which Mr. Wilson is fully entitled. When Congress enacted Section 5301, it did so with a specific purpose in mind. And this purpose is crucial to the analysis today. That purpose is to protect veterans from losing the only means of self-care that they have. If I could jump to my main problem. I think if you look at Porter and the other cases, it seems that perhaps your client is correct. The problem that I have is how many levels of transfer the prison is responsible for keeping track of. So here you think, okay, he had it sent to his bank account first and then to his account at the facility. That's not too hard. But what if the inmate had it sent to one bank account and then to another and then to a third and fourth? How many layers is the prison responsible for keeping track of to make sure that they don't take funds that are ineligible VA funds? So I don't think there's a specific number of levels, but if the facility is concerned with an inmate, for example, saying that funds are exempt VA benefits when really they're not in order to trick the facility into not taking those funds away from them. There are other ways, administrative ways of going about that. So if a veteran has paperwork, a letter from the VA saying this veteran receives this amount of money every six months or every month to verify that the veteran is actually getting those funds, they are legitimate and the inmate is not trying to pull one over on the facility. But what about a case where here you're talking about an inmate pretending money is a VA benefit. What about where, to Judge Grant's question, the money has gone from one account to another before it hits the prison inmate account and the inmate has not indicated that these are veteran benefits. How is a prison supposed to know money is fungible? So the jail could require the inmate to provide paperwork showing bank transfers, showing a trace of where the money came from if they are suspicious that there is a problem or they want to have some sort of paper trail in order to prove that the VA benefits are what they say they are and that there is no problem with transferring the money. But here y'all are coming after two different types. You've got one situation where he was sending it to his bank account and then it was coming to the prison inmate account. And from all I can tell from the record, the prison didn't understand that those were VA funds. Then when the problem was noticed by the inmate, then the VA was sending the funds directly and the prison was noting them as VA funds.  And as far as I can tell from your argument, it seems to be buried in the qualified immunity piece or in the statute of limitations piece. You are saying that the prison officials did something wrong when they started using funds that had not been marked as VA funds when it was coming from bank account, correct? There were problems at both stages. So yes, there's a separate problem with the money being taken before. From the credit union. Right, when it's transferred in from the credit union. So how does the prison know? Well, the problem is with the federal administrative code. So that's the code that requires it to be directly deposited. And the point that Mr. Wilson makes is that it violates the supremacy clause by putting in this additional requirement that it has to be directly deposited rather than it could be from any account. Because 5301 does not have that limitation. The benefits are protected regardless of whether they are put into a separate credit union first and then transferred in or if they are directly deposited. I guess the question is just when did the benefits become not benefits, right? So I think under the Supreme Court's precedent, I think you would concede that if he took his benefits, bought a car, and then sold the car, at some point those benefits would no longer be benefits, right? Right. And so there is no bar on veterans spending the money the way that they want to spend it. The problem here is that the benefits, he did not have the benefits in his possession when they were seized. So the protection is on benefits that are under the statute, quote, due or to become due. They are benefits that are to accrue in the future. And this is to protect veterans who are expecting that money to come in who don't have it yet. In this case, he only had three cents and he was waiting for his veterans' benefits to come in. It's to protect veterans from giving away something that they're entitled to before they even have it. Let me ask you this. So, you know, more sort of fundamental questions. So the statute prohibits assigning your benefits away and it prohibits creditors from seizing your benefits and whatnot. Was this a seizure of his benefits or was it an assignment of his benefits? What exactly makes this a seizure or an assignment of his benefits as opposed to him just using his benefits to pay for something as it comes due, a bill as it comes due? So there's two parts to that. And first, the consent, the form that he signed saying that Co-Risen could collect from his account, that was a prohibited assignment. And that's from 5301A3A that says that if a beneficiary enters into an agreement with another party whereby that party could get that benefit instead of the beneficiary, then that agreement is considered an assignment and it is prohibited. Okay, so just unpack that. So if he were, let's assume he's not in the prison, right? He's just a veteran going about his business and he signs all sorts of stuff. He's paying his light bill out of this bank account. He's paying his mortgage out of the bank account. He's paying all sorts of bills out of the bank account. Are all of those direct sort of payments out of his bank account or all those invalid assignments of his benefits? If he assigns them at the time that he does not yet have them. So if he were to get that money first and then he has his veteran's benefits sitting in his bank account and he has bills to pay, he could then use the money to pay his FPL or pay his water bill. But if he does not yet have that money and he's waiting for it to come in, he can't preemptively assign the benefits to go to somebody else. And so here, the consent form was, I don't have these VA benefits in my account yet, but when I do, then they can be used to pay for the medical bills. And as soon as the money hit his account in April of 2015, that is when Corizon sees the money. And so it is both a seizure and it was a prohibited assignment because he signed the consent form that is prohibited under the statute. I've got a question about Corizon seizing the funds. The complaint alleges that Corizon seized the funds, but then the exhibits that are attached seem to show that the Department of Corrections seized the funds. Does that give you a problem? It does not. The timeline of it was he signed the consent form and then because he did not have the money in his account, he only had three cents, the DOC put a hold on the account, and then once the money hit his account, that is when Corizon seized it. And so Corizon would not have been able to seize it unless the DOC put that hold on his account. Did Corizon seize the funds or did the DOC seize the funds? Corizon ultimately seized the funds because the money went to them. Well, right, so ultimately I think it's a little bit different than whether they seized the funds. My concern is from my reading of the complaint with the exhibits, it seems that the DOC seized the funds and then Corizon was the payee from the DOC. So I'm concerned that the complaint should have targeted the DOC for that seizure, in which case since those funds were direct, it likely would have been a problem. But since Corizon was merely the payee rather than the seizer, I'm concerned that maybe there's too much of a gap there. So our argument is that although the DOC put the hold on the account, because the money went to Corizon to pay for the medical expenses, that it is Corizon that seized the benefits because otherwise the DOC would not have had to put the hold on the account. Does Corizon have direct access to the inmate account? Or how does the money get to Corizon or any other vendor? Is it coming directly from the inmate account to Corizon? Is the Department of Corrections? Who's sending it? Who takes the money out? I'm not exactly sure. I don't want to misrepresent exactly how the procedure works. But from my understanding, it's that Corizon is part of the facility because they provide the medical expenses. And so I believe that it's Corizon that takes the money, but the DOC oversees Corizon. But I don't want to give this court a full misrepresentation of the facts. Yes, Judge Brasher has one more question. One question about how this works too. So the statute, and just correct me if I'm wrong, so the way I read the statute is, you know, let's say I'm a veteran and I just enter into an agreement that assigns my benefits to somebody. And it's literally just an assignment. I say you have the right to all of my benefits going forward. The way I read the statute is the only thing the statute does is say that that assignment is invalid and unenforceable. Am I right about that? Is that all the statute does or does it do something else? Is there a cause of action created? Is there some damages that someone would have to pay or is it just you tried to assign these benefits, the statute says you can't do that, therefore the assignment is unenforceable? Well, it does create a cause of action because if an assignment is unenforceable and the assignment goes through and the person is able to receive the benefit that is assigned to them, then that would create a cause of action because there was some sort of consequence of the assignment. If it was a case where it was assigned but the money never actually went to the assignee, it would be, I think, a different analysis because there would be no harm, but here there was a harm. I guess in that situation, my benefits went to this person I assigned my benefits to. All I would do is just have a cause of action against them to get my benefits back. That's all we're talking about is you got my benefits through this invalid assignment. Give them back to me. Correct. In this particular case, what Mr. Wilson wants back is his VA benefit. That is what he's asking for. Isn't 1983 your cause of action here? We do have a 1983 cause of action because his property was seized in violation. It is a legal seizure, and there's also the supremacy clause argument because the Florida Administrative Code is in conflict with 5301, and so his claim is under 1983 because his property was taken from him in violation of federal law. Right, so what you're asking for is give me my benefits back, and because you've sued under 1983, I guess you're asking for attorney's fees? He did ask for attorney's fees in his original complaint. That's correct. Okay. Thank you. You have reserved time for rebuttal. So, Ms. Reeves? May it please the Court. Good morning, Your Honor. I'm Marie Reeves with the Florida Attorney General's Office. On behalf of the Department Defendants Morden Cumbie, Mr. Van Antwerp, and the Secretary of the Department, currently Mark Ginch, I'd like to address the supremacy clause issue and the motion for summary judgment first. Ms. Reeves, before you jump into that, could you just tell us how the mechanism of a prison account when somebody is receiving funds, when Corizon is receiving funds, how is that happening? Yes, I believe I can shed light on that, Your Honors. There was a written consent here, and the argument would be correct if someone were to go up to a veteran and say, Hey, you want a loan? Okay, sure, I'll give you a loan. Just assign your next three VA checks to me, and you can have your loan. That assignment would be prohibited, for example. Or if the inmate were to say to someone, Hey, send my next three VA checks to Union Bank, please. I haven't gotten them yet, but I'd like those to go to this bank. The federal statute would prohibit such an assignment. But here, we have something totally different. We have the written consent, and that is on Appendix 1, page 60. Looking at the facts, you can see this was not a one-date transaction. Like some of the legal postage where an inmate needs to mail something, that's all done at one time. Here you have three dates. The appellant would only point out the first two, but I'd point out the third date as well. You have the first date where the inmate signed the form on February 20, 2015, and that's an inmate payment agreement where he was able to choose two options, either send the bill to his family or pay his inmate account. He chose the option of having his inmate account billed on that date for $37.95. The second date is the hold date of March 4, two weeks later. What happens is the inmate is at the medical clinic, which would be the equivalent of us on the outside world going to our doctor's office. He decides he wants the paper copies. He asks for them. He fills out the written inmate payment agreement on the date that he asks for them, February 20th here. He gives that to the medical clinic, Corizon, which is a third-party medical provider. No longer. It's a different one now, but that gets handed to them. They take it. They submit it to the institution where the inmate is housed. That institution sends it on to their accounting office. It happens to be in Tallahassee. That accounts for the two-week delay. Tallahassee, the accounting office of the department, got the request, and the appellant is correct. There were only three cents in the account on February 20th and three cents in the account on March 4. The department put a hold on the inmate's money. The department then, that paperwork goes back to Corizon. Corizon learns that a hold is placed, and when funds are available in the inmate's account because he signed a voluntary agreement, nothing involuntary, no seizure, at the point the funds are available, Corizon can get paid. The inmate goes to Corizon, reaches out his hand, and says, okay, may I have my copies now? And that ratifies the whole transaction. The copies are not handed to him until Corizon, the third party, is paid for them. So that was April 14th. The question I think that I had and maybe some others is, it sounds like Corizon is not the one taking the funds out. Is that right? They ultimately received the funds, but Corizon did not actually remove the funds from the account. Is that right? The funds come out of the account, and that purchase written agreement is crucial to getting them from the inmate's account directly to Corizon. It's like a purchase agreement. So DOC was not the one who removed the funds. Corizon actually directly removed the funds itself? DOC placed a hold on them, and they are allowed to come out once the funds are available, and that's about as specific as I can be on that. So as far as Corizon is concerned, they don't know any of the inner workings of this inmate account. They know they've provided a service and they got paid, correct? They didn't place the hold? That's correct. They have no idea what has gone on inside the inmate account, correct? That's correct. Please note the April 14th date, the date that Corizon was paid. Now on that date, if you look at the account records, and that's very important, there's one page specifically that's very important there. On that date, the inmate had already received two additional VA checks into his account and made six canteen purchases. So I think this answers one of the questions that the court asked previously. The inmate was acting as if his account money was his. He had taken dominion and control over all of the money in his account before the April 14th date that Corizon was paid. At some point, the funds do become the inmate's funds. They don't stay VA funds forever. They stay VA funds and they are coded as VA funds until they come in and are deposited, and then they are the inmate's funds. So this written consent really has the three dates, and it is a three-phased transaction, unlike some of the examples that the appellants would ask the court to focus on. So the inmate did not use future funds at all because of the April 14th date. Those were present funds. And he ratified it. How can we know that? So at this stage of the case, you're citing something for that. I just want to know what it is. Yes, I would like to tell you where that is. There is a declaration of Rita Odom, and attached to that declaration is the inmate trust account. The declaration is Appendix 1, page 118, but I believe that the account records go over to they follow her declaration. So if we look at that document, it will show that at the time, that basically he had money when he spent the money on these copies. Yes, Appendix 1, page 127, I believe. But did he have money when he promised the money for the copies? At that point, he had three cents when he himself brought about this whole request. It's a request, a directive on his part. Bill my inmate trust account. It's a very simple one-page document. It's right here. Bill, he gets to check off what he wants. Bill my inmate trust account. He's asking for the copies. He's asking that his account be billed all voluntary, no seizure. I believe the appellants have latched on to the word seizure inappropriately. But I'm latching on to the word assignment. Isn't that him assigning his benefits before he has them? And isn't that prohibited by the statute? That is – it's a voluntary assignment here, but I do not think this falls in the same category as what the appellant is saying here. I can say that there is a case in the record, the Higgins case. That's a good example where money was seized. The Department of Corrections took $1,000 out of an inmate's account to pay to a victim because he had pled guilty to a sexual assault crime. This is in another state. And the department took that, and there was actually no consent there. I don't even think there was a pre-deprivation hearing there. That case held that that was a seizure. Yeah, so go back to assignment. I mean, I think I'll just say I'm fairly convinced that there was no seizure by the medical company, Corizon Health. What makes this not an assignment, I guess, is it perhaps that he just – he incurred some liability, but he didn't specifically give Corizon Health the right to his VA benefits as a way of satisfying that liability? Well, he was just asking all along for something that was optional, something he did not have to have. He wanted himself. I just see this as a signed consent. Inmates can do this. They are allowed to incur obligations in prison. Inmates can, but it seems that although perhaps the statute is a little bit paternalistic, it seems that it prohibits both voluntary choices, assignments, or involuntary payments, seizures. How is this not a voluntary assignment? I think it is a voluntary action, completely voluntary on the inmates' part. Yeah, who cares if it's voluntary? Where do you see in the statute that it has to be involuntary as opposed to voluntary or involuntary? Well, I think a seizure is something that happens outside of your control. No, not seizure. Not assignment. You've convinced us. We're convinced it's not a seizure, but why is it not an assignment? I think that it is more of a purchase and a request and a directive to do something. Fill my inmate account is more of a direct association. And isn't the focus more appropriately on the inmate account than on the VA benefits? And let me explain. The inmate account can receive funds from all sources, correct? Like friends, family can put monies into the inmate account. It's not a uniquely veterans' benefit account, correct? You have inmates who aren't veterans, right? Yes, correct. So if he has not executed something that assigns his VA benefits, it simply is saying, pay out of my inmate account, then has he not even touched the statute that deals with the assignment of VA benefits? He said, pay out of my account, wherever the funds may have come from. So he wasn't specifically assigning VA benefits. Is that correct? Yes, I would agree with that, Your Honor. What document did you just hold up? I didn't have a chance to figure that out. Oh, I'm sorry. This is Appendix Volume 1, page 60. So that's the document he signed to enter into the transaction? Yes. He signed it up here in February, and the hold was placed down here March 4th, two weeks later. And the copies were charged and paid five weeks after that, on April 14th. But in that document, he does not say, I assign my VA benefits to pay this amount. Not at all. So he says, get it out of my inmate account, wherever those funds may have come from. That is correct, Your Honor. So you wanted to start with the Supremacy Clause issue, which I gather the way you—correct me if I'm wrong, but I gather the way you see that issue is the Supremacy Clause issue is the question about whether there needs to be some kind of declaratory or injunctive relief. Is that the same issue you're talking about? I wanted to make the point that the Florida rule is totally consistent with the federal statute. It's parallel to the federal statute. It's just a way of implementing things that make sense. We have Title 33, which deals with the Department of Corrections, and they have to have procedures because they are a state institution. And it doesn't say anything that would go against the federal statute at all. It just says that the department shall not place liens on an inmate's trust fund for medical copayments, legal copies, or other department-generated liens for VA benefit checks mailed directly in. And so—because it would be too much of a burden for the department or any other agency to have to verify the source of funds coming in. That would not be a proper burden for the department there. Yeah, let me ask you this. Is that issue even ripe in front of us? Because it seems like—and maybe I'm wrong about this, but it seems like that issue is sort of moot because he's now receiving his funds directly from the VA. He's not going to go back to this circuitous system where he sends them through his mother or some outside account. Yes, I believe so, Your Honor. I believe it is moot. Not only did it happen nine years ago, but his amended complaint does not even contain those arguments. And he has been getting his funds directly since August 2012. So, yes, I believe there's actually no standing on that issue. Everything's fine now, going smoothly, as I believe the Florida rule is designed to promote. Are you appearing on behalf of Corizon as well as the department? No, Your Honor. Thank you. Your time has expired. Thank you, Your Honors. Ms. Altanaga, you have five minutes left for rebuttal. Thank you, Your Honors. So, first, to address the question of whether Corizon was the one receiving it, in Exhibit C, Mr. Wilson did attach documentation that established that Corizon was listed as the party that was to receive the funds, not the DOC, so it wasn't the DOC getting that money. The funds were going directly to Corizon to answer the question that was asked earlier. Now, as far as the concern about whether this is an assignment or a seizure and what is allowed and what is not allowed, the Ninth Circuit did say in Nelson v. Hess that future assignments, assignments of funds that are to accrue in the future, that is what is prohibited. And in that case, there was a cause of action because of that reason, because the funds were not yet in the person's account when they were at the time of the assignment. As far as the timeline goes, when he signed the form saying, fill my account, he only had three cents to his name. He had not yet got his VA benefits deposited into his account. And so when he says, fill my account, he doesn't have anything to pay them with. But the statute, 5301, is meant to protect veterans. The statute contemplates, and other courts who have looked at this issue want to protect veterans who serve this country from losing the only source of income that they have left. And so he did not specify, fill my VA benefits. But even if he said, fill my account and the account is going to have VA benefits in it, under 5301, he could not assign those benefits, voluntary or involuntary. Let me ask you, you know, that's a, I think that you're right about the policy of the statute. Let me ask you about a concern I have, which is that this statute doesn't just apply to prisoners, right? It applies to VA, you know, folks who are just walking down the street. If we read this to be an assignment, a prohibited assignment, would we basically be telling every power company, every, you know, children's daycare, everything that an individual pays sort of directly out of their bank account on a monthly basis that they can't do business with veterans anymore? I mean, is that what we would be telling them? We're not saying that individuals can't do business with veterans. We're saying that veterans cannot assign money that they don't yet have. So once the VA benefits hit their account and they have that money, then they can pay their bills. Yeah, and I guess that's where I'm having some confusion. I mean, I don't know how you pay your bills, but the way I pay my bills is once a year, I give whoever it is the authority to take that money out of my bank account. I don't write a check every month to everybody that I owe a bill to. I assume that's the way most veterans pay their bills too, and so my concern is that are we basically illegalizing those transactions because we're saying that they're assignments of veterans' benefits that are illegal and that banks and financial institutions and people like that just can't spend that money anymore out of veterans' accounts. How would we avoid that? I don't want to make any assumptions about how a veteran may be paying their bills. The problem is that it's an unfortunate truth that many veterans don't have the ability to pay their bills maybe the most efficient way. Veterans, unfortunately, in this country experience poverty just like non-veterans do, and so the statute is to protect our veterans from feeling the pressures of poverty and assigning something that they have the right to, that they earned, because they have that financial pressure on them. In this case, that is all he had was his VA benefits, and so the statute is meant to protect Mr. Wilson and people like Mr. Wilson from having the only source of income, the only means of providing for themselves after they've served this country, having that taken away from them. What about the mootness issue on what we're calling the Supremacy Clause issue, but you could also call it the regulation issue or whatever? It seems like he's kind of fixed that problem a long time ago, so how is that a live issue in the case? This issue is not moot because there is an issue that stemmed from him changing the deposit directly into his account, and that problem is that he now has to have two addresses. He has his money going directly into the account, and correspondence, mail, deadlines, issues that happen with the VA benefits, that mail can't go to a bank account. It has to go to a separate address, and what happened to him, unfortunately, is the VA was sending different things to different addresses. He missed 10 VA benefit checks because of this issue with the different addresses. He missed correspondence. He missed deadlines having to do with his VA benefits, and so the harm here is that because of this issue, because he had to bifurcate his addresses, he missed out and there is a sufficient likelihood for standing purposes that he could run into this issue again, and so the issue is not moot, and in fact the lower court did not make any findings as to the Supremacy Clause issue, and so we would ask that this court send the case back to the district court so that the district court, in light of the fact that Mr. Wilson does in fact have standing to make findings about whether or not the Florida Administrative Code violates the Supremacy Clause. So even though he's been doing this since 2012, he wants to go back to the old way? Yes, that is correct, Your Honor. I know you're over time, but I don't completely understand the two address issue. Can you tell us a little bit more about what happened there? So when the prison officials told him that in order to be in compliance with the Florida Administrative Code, he had to directly deposit his account, he originally had his correspondence going to a physical address, which he still does, but in this case the VA benefits have to be mailed to the jail and then the jail puts it into his inmate trust account, and so it's these separate addresses. It's not the same thing as just having the VA directly deposit it into the Navy Federal Credit Union like he was doing before. It required him to have two separate mailing addresses on his VA file, and that was the issue. So in August 2012, that's when he bifurcated his addresses and had these two, and while that temporarily solved the issue of confronting the Florida Administrative Code, it caused him harm, and his harm was that he missed out on 10 checks, and that's all he has is his checks. And so there was harm. He did sufficiently. I guess I don't understand how he missed out on 10 checks. Because I suppose that veterans, the VA doesn't normally have two addresses, and so things were mistakenly being sent to different addresses. So his VA benefits were being sent to the wrong physical address and he wasn't getting them, and then the correspondence can't go to a bank account, and so his deadline notices were being sent to the jail, and then the jail just would send them back, and so he was missing out on several types of mail because of the confusion. Thank you. Thank you. Your time has expired. Thank you both. We have your case under submission.